Good morning. I'm Philip Brooks representing Mr. Hurd. And may it please the Court, I'd like to spend the time available this morning in addressing the issue of Mr. Hurd's repeated refusal to do a demonstration of how the shooting happened and the prosecutor's use of that refusal in his arguments to the jury. The California Court of Appeal decision in this case was contrary to clearly established federal law as established by the United States Supreme Court in Miranda and in Michigan v. Mosley. So you're arguing that there was Doyle error here? That's right. And also, it's actually a violation strictly under Miranda because Miranda says you have a right to remain silent and you won't be penalized for it. I think the added wisdom we see in Doyle is that if you're just cross-examining about an inconsistent statement, that may be a different matter. But here, that wasn't what was going on. So I think the law is clear in the United States Supreme Court, but what the California Court of Appeal said was a defendant has no right to remain silent selectively. And that's the thing that we think makes it clear that its decision is contrary to the clearly established federal law because in Miranda, the United States Supreme Court pointed out that they said, although they had held in Rogers v. United States in 1951 that a witness before a grand jury may not, in certain circumstances, decide to answer some questions and then refuse to answer others, that Rogers decision has no application to the interrogation situation that we, the Miranda Court, are dealing with. So they're saying we're distinguishing Rogers, and in the Miranda interrogation situation, a person can answer some questions and yet refuse to answer others. So that's directly contrary to what the California Court of Appeal held in Mr. Hurd's California appeal. And we think that it's so contrary to it that if the court had applied the right rule, the California Court of Appeal may well have come to a different result. There's a further implication of the fact that the California Court of Appeal applied the wrong rule in deciding the case, and that is that that means that this court does not owe the same deference to the California Court of Appeal decision that it ordinarily would under the AEDPA. For example, a case that we're probably all familiar with is Wade v. Terhune, that this circuit decided in 2000 involving a Batson issue. And in that case, the California courts have been applying the wrong standard for a prima facie case in a Batson claim, saying that the movement had to show a more likely than not standard in order to establish a prima facie case, whereas Batson only required a reasonable inference. And the circuit said that because of that, they did not owe the California Court of Appeal decision in Mr. Wade's case the same deference that ordinarily they would. And we think it's clear that in this case, the same situation is present. Now, it may be initially asked whether refusing to do a demonstration is the same thing as refusing to answer a question. Is that remaining silent? I think that we've shown that it clearly is, because doing a demonstration under the law is a testimonial act, so therefore a request to do a demonstration is a question asking for an answer, and it's really just the same as refusing to answer a question. Mr. Brooks? Yes. Let's assume for a moment that the refusal to give a demonstration as to how the defendant showed the use of the gun or what he was doing with the gun, the refusal to do that just says, no, I'm not going to do it, I'm not going to do it. Suppose that's a proper Miranda assertion and it should not be used against him, and yet in this case it was used against him. So we do, in fact, have a Miranda violation. Now, then would the state court next have to determine whether that violation prejudiced the defendant? That's what the California Court of Appeals should have done, and I think that's the question that would face this court, yes. But are you saying that the California Supreme Court or Appellate Court, did no California court make the determination that he was not prejudiced? The California Court of Appeals decided that he wasn't prejudiced because there hadn't been a violation. Okay. So our argument is that if... And the Supreme Court simply what? Denied review. That's correct. What does the record reflect as far as proposed instructions from the party to the trial court requesting jury instructions show as to Miranda rights? I don't believe that there was an instruction on that. Okay. Well, if I was following up on my question... Yes. I guess what I was getting at is there's a federal court. We ask whether the decision by the state court was reasonable or something like it. It could have been made. Not that we would have made a different decision, but that that decision was okay, it could have been made. But you're saying here the California court never made a decision that there was a Batson error, but it didn't make any difference. Or a Miranda error, rather. Miranda, I'm sorry. Miranda error, but it really didn't make any difference. The California court never decided that. Is that correct? Right. The California court said that it was proper for the prosecutor to argue that Mr. Hurd's refusal to do the demonstration constituted evidence of guilt. Okay. And there was no decision they said, but even if it were improper... No. ...they didn't go that far? I don't believe so. Okay. So what the circuit cases show in interpreting or assessing the effect of this kind of error and whether reversal is required is that, first of all, they look to what was the intent of the prosecutorial comment on the evidence or the use of the evidence. Was the prosecutor drawing attention to the defendant's silence and arguing that that silence was inconsistent with innocence, that that's not something an innocent person would do, to remain silent in the face of a question like this? If so, that's an improper use of it and indicates prejudice. If, on the other hand, the prosecutor simply says, well, you know, when he talked to the police he said, A, and he testified here at the trial and he said, B, and so that's inconsistent, now that would be a different situation if he's just arguing inconsistent statements. But it seems to me that in this case the circumstances are very clear, that he was pointing to Mr. Hurd's refusal and saying that that's not something an innocent person would do. He, in his closing argument, which is in the excerpt to the record, and in his opening statement, he remarked to the jury how many times Mr. Hurd had refused. Now, right off the bat, logically, the number of times wouldn't have anything to do with inconsistencies between the statements. He's just saying, this man is repeatedly refusing. And then he goes on to say, well, why would he do that, ladies and gentlemen? The reason is that he can't show through this demonstration that he is innocent. If he were innocent, he'd be able to show you by doing this demonstration, and he knows that that's not what's going to happen, he knows it's going to make him look guilty, and that's why he won't do it, and that's why he should convict him. And that, it seems to me, is clearly pointing to the silence, the refusal to answer, the refusal to do the demonstration as evidence in and of itself, and that's a violation of the Miranda in the Fifth Amendment. Could we look at the record and determine that, yes, this was a Miranda error, but the evidence was so overwhelming it really didn't make any difference, regardless of whether the state court determined that or not. This court could do that, but I think that for this court to do that would be inconsistent with the circuit decisions in the Arnold v. Reynolds case that we've cited, which was reversed in a situation where the defendant said, I'll talk to you orally, but I don't want to go on tape. This was in Oakland, and at that time they had a practice in Oakland. They only taped parts of the interrogation. So the officer then turned on the tape recorder and said, Now, you've agreed to talk to us, haven't you? And, yes, but I won't do it on tape. And he said, Well, what about this? And he asked him six or seven questions, and each one Mr. Arnold said, No comment, no comment, no comment. He was convicted, and on appeal the Ninth Circuit said that was a prejudicial use of his refusal to answer the question that required reversal of the conviction. It seems to me we're in the same situation here. There was also the case of Mr. Jumper. I've cited in the reply brief where he was arrested for transporting illegal aliens, or maybe I guess it was marijuana, but it was illegal cargo in any event, and he answered many of the officer's questions, but there were certain questions he wouldn't answer. They said, Now, don't you think this is an unusual way for somebody to be transporting marijuana? And he said, I just don't want to answer that. And they said, Well, is it usual to get somebody to drive a truck like this in this sort of a situation? And he said, I'd rather not answer that. I just don't want to answer that. And there were two or three other questions of that nature that he wouldn't answer, and the prosecutor used that as evidence that he was lying, that he was guilty, and the circuit court found that that was a prejudicial use of the Miranda silence that required reversal. And let's see, in the Canterbury case that's cited in the briefing, once again, there's a finding that the use of the defendant's silence, very similar to what we had here, was serious enough to require reversal. And I think to affirm in this case in the face of the record we have would also be inconsistent with the reasoning of a California court of appeal case I have cited in a court called People v. Paraki, where the defendant was in a similar situation. I won't go through all the facts of that case here, but it's in the brief. And time and time again, the circuit courts have found these violations are serious. They're just the sort of thing that a jury may latch on to and believe is really evidence of guilt when it really isn't. And it's too important a right and too dangerous a violation to simply affirm the conviction. So that's a long way around to say this court would have the power, certainly, to look at the record and say it's a harmless error. But we have to say that it didn't contribute to the verdict. The court would have to say under Chapman v. California that the error didn't contribute to the verdict. And it seems to me that would be a very difficult finding for an appellate court to make at this stage, particularly in light of the other circuit law on the subject. You had one jury hung and the other jury came through, right? That's right. Essentially the same testimony. Well, of course, as we've shown in the briefing, there was a very big difference in the other testimony in the case at the second trial because the prosecutor was allowed to introduce a huge amount of hearsay evidence that had not come in in the first trial. I'm sure the court is probably familiar with that, right? It's, for instance, things like the decedent's lover saying, yes, he told me that Mr. Hurd had pointed a gun at her and dry-fired it. That was kept out in the first trial because it was held to be evidence of a specific act, not a statement of a state of mind. And I've listed in the briefing a comparative showing the testimony of the eight witnesses that gave testimony about hearsay statements of the decedent showing how the testimony was hugely different in that aspect in the second trial. And I think that may be what tipped the balance from a hung jury over to a conviction. It seems to me that's a very likely hypothesis anyway. Let me just see if I've got any other points. Let me just close by saying I think it's clear from the record that Mr. Hurd distrusted the police during the interrogation, that he felt the police officers were lying to him. And, in fact, they were lying to him, and they admitted that. They were telling him they had ballistics evidence that would prove the shooting could not have happened the way that he said it. They had no such evidence. In fact, it's often occurred to me that maybe the Miranda warnings should be revised in light of modern police practices so that the officers would have to say, now, we're going to be allowed to lie to you in interrogating you. Do you still want to waive your rights? It seems to me it would cut down on the waivers in these cases. But in this case, they were untruthful with him, and he was right to distrust them. And distrusting the people that are interrogating you and the fear that you may even inadvertently incriminate yourself is a very perfectly good reason for invoking your Miranda rights. And I think the record shows that's what Mr. Hurd was doing here, and he shouldn't have been penalized for it. So with that, I'll submit unless there are other questions. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Deputy Attorney General Blythe Leskay for responding. Our position with regard to the defendant's statements about doing a demonstration is threefold. First, that the law is not clearly established that a suspect may invoke Miranda in the way that he's contending that he did here, which is answering all of the officer's questions. Some of the answers were not to the officer's liking and at this point. And then later on, the defendant claims that that was an invocation of Miranda, even though at all times he expressed a willingness to continue talking to the officers. Second is that here the defendant did not invoke Miranda at any time. He waived it in the very beginning of the interview. There's no question about that. As he was talking when he was asked to do his demonstration, he repeatedly said, I can't do it. I don't know what happened. It's not clear to me. He even said, I would do it if I could. He indicated it at all times and he corroborated that later at trial. He was consistent throughout. He was even consistent at trial saying the reason I didn't do a demonstration is because I wasn't clear about what happened. I answered the officers' every question. It is particularly important because after a valid waiver of Miranda is given, any reinvocation after that must be clear, unequivocal, and unambiguous. And at the very least, the defendant's statements here were not clear, unequivocal, and unambiguous as far as him invoking Miranda. Certainly the interrogator wasn't impressed with getting an answer to his question, was he? Well, he certainly didn't get the answer that he wanted. What he wanted was for the defendant to answer to the question as the investigator thought he should receive. Right? Well, the investigator was obviously looking for particular kinds of answers. Exactly. And the defendant was answering in a different way. I don't think that that's any different than an officer saying, well, you did murder your wife. Right? And him saying, no, I didn't. He's answering the question, just not giving the answer that the officer wants, which is not an invocation of Miranda. At no time did the petitioner remain silent. At no time did he say, I want to invoke my Miranda rights. Even after the interview when he was questioned, he's never said, even up until today, he has never said, what I was trying to do was invoke my Miranda rights. What he said was, I didn't do a demonstration because I wasn't clear about what happened and I didn't want to guess. Which is perfectly reasonable, and the jury heard that. I just want to address a couple of the cases, the Ninth Circuit cases, that petitioner has brought up. One was discussed in his reply brief, which is United States v. Jumper. But he said he didn't want to do the demonstration, right? He said he didn't want to do the demonstration. What's fuzzy about that? Well, he said that he didn't want to do it because he wasn't clear about what had happened. He said he didn't want to do it, he didn't want to guess, and he would do it if he could. At all times he indicated... Well, what if he said, asked me to talk, and he said, I don't want to talk to you. I don't know what I'm getting into. I'm not clear in what I should talk to you about. I may be confused when I talk to you, but anyway, I don't want to talk to you. He said that. If he had said that? Yeah, can you bring that up? After waiving Miranda, and then after giving a voluntary waiver of Miranda, and then at some point during questioning, he says what Your Honor just said. I don't want to talk to you. I don't want to talk about this subject. Well, I... Period. I think if he says, I don't want to talk to you about this subject, I think that's an invocation of Miranda. And I think that the questioning at that point on that subject would stop. He said, I don't want to talk to you about this because... I'm not clear about it. I'm not whatever he said about not doing the demonstration. Instead of saying, I don't want to do a demonstration, he'd say, I don't want to maybe answer that question, et cetera, et cetera. Well, I think if he's saying, you know, I want to answer your questions about how the shooting occurred. I really want to, but I can't because it's not clear to me. I don't remember. If I did remember, you know, if I knew what happened, I wouldn't have done it, but I really do want to, you know, talk to you about what happened, which is equivalent to what the defendant did here. He specifically said, I would if I could. I would show you, but I can't. I think that that is different than saying, I don't want to talk to you anymore. He's saying, I would if I could. I would do that for you if I could, but I can't because I'm not clear about what happened. It's a refusal, isn't it? He's not going to cooperate and respond to the question with action. That's true. He doesn't cooperate. It should be pretty clear to the detective that that's what he was saying. It's true that he was saying that he wasn't going to do it, but I don't think that that is an invocation of Miranda. And importantly, when you talk about a Doyle error in particular, the whole purpose of Doyle error is, you know, when a defendant is given the Miranda rights, there's this implicit promise that what you do not say will not be used against you. And when you waive that, when you waive your rights, and here in particular the officers are telling him, we are going to use what you're saying against you. We are going to use your refusals against you. And so there is no implicit promise. The defendant here is not misled in any way. And he did have... They say anything you say may be used against you in a court of law. Right. That's what they say at the outset. And he waived. He said he understands. He said, fine, I'll talk to you. And I'll talk to you. And he continues. And then when he says, well, I'm not going to do a demonstration for you because I'm not clear about what happened, and I don't want to guess, and I don't trust that you're going to say, you know, I don't trust that you're going to interpret it correctly, or whatever it is that he says. Well, the message was he wasn't going to tell them and give them a direct answer that they were looking for. And what the officers respond to him with is, how do you think this is going to look in front of a jury? How do you think the DA is going to think about this? They don't say, you know, oh, well, you know, if you don't do a refusal, then, you know, that can't be used against you. There's no implicit promise. They go the other way, and they say, this is going to look bad for you if you don't do what we're asking you to do. So there's no implicit, there's no government motivation for him to, quote, unquote, remain silent. They're just putting pressure on him, that's all. Well, correct. It's going to look bad. But the purpose of Doyle is that to protect somebody who, when you're given this government assurance that your silence or your decision not to talk to us is not going to be used against you, that you can rest assured that, in fact, will not be used against you. Whereas here, there is no such government assurance. In fact, they go the other way and say, you know, we are going to use this, and it's not going to look good for you. If I could just address. . . What if they give them a Miranda, and they take, and they say, well, I'm invoking Miranda, and I'm going to stand on my right to remain silent. And they say, well, this is not going to look good for you. Well, at that point, he's already invoked Miranda. And here. . . He's invoked his right to remain silent when he said, I'm not going to do that. People express themselves in many ways. Right, and I think. . . A common investigatory method is to ask the defendant to physically demonstrate how the crime was accomplished. It goes on all the time. It's our position that when you look at the defendant's answers to the detective's questions here, as a whole and in context, he did not invoke Miranda. He did not give a clear and unequivocal invocation of his right to remain silent on the subject of a demonstration. And moreover, even if he had, the California Supreme Court's decision that he did not was not unreasonable, even if this Court believes that he did in fact. . . is to respect a person's right not to incriminate himself or herself. And when the prosecution has got to resort to pushing people or cajoling them into talking or saying or making statements that might incriminate them, they're showing, I think, a lack of respect for Miranda. And that has all kinds of ramifications in the investigatory process. Well, as an abstract principle, I would not disagree with Your Honor's position. However, as it applies to the facts of this case, the defendant unequivocally waived Miranda at the outset of the interview. And he did not subsequently re-invoke that right. But even if this Court, as I said, believes that he did in fact invoke that right, under the context of the entire interrogation and under the context of what Petitioner says and even what he later says at trial, again, he was never inconsistent. He remained consistent throughout the interrogation and then again at trial. Quite to the contrary, the prosecution detectives in this particular case were essentially telling him to answer because they were going to make this whole incident look very bad in front of the jury. Now, that's 180 degrees away from what Miranda protections are. Except that Petitioner was not silent. Miranda protects somebody who chooses not to speak. It doesn't require total silence. You can take Miranda in pieces, as I understand it. You can take your Miranda rights. They can ask you, was it a sunny day? And you can say yes without invoking Miranda. And you go to the weather service and you find out the sun was out. But if the next question is, did you shoot your wife? And he says, I refuse to answer and invokes Miranda, that's all right. That is all right. However, here we have a defendant who is not saying, I'm not going to talk about the shooting. He's not saying, you know, he's talking about it in as much detail as he can. And he's saying, I want to do a demonstration for you. He's trying to cooperate. And he's answering, as he says at trial, I answered the detectives' every question. So the detectives testified, the witness didn't have any knowledge of this, and he told us that, and we respected it, right? Well, they found evidence to the contrary based on other evidence. No, the counsel argued that he waived his Miranda rights. What was the other evidence to the contrary you just referred to? Well, there was strong evidence to the contrary. First of all, one of the defendant's coworkers had conversations with him before the killing of his wife. He was going through a divorce, and, you know, he went to one of his coworkers and said, you know, how loud is a gunshot? And he says, you know, I think it would be much easier to just – I'm sorry? That wasn't evidence. This is the evidence that was against – Correct. Oh, I absolutely believe there was enough evidence without this. Well, I guess that was a decision that the DA made that that evidence was – I understand what you're saying. Well, I understand what you're saying. However, there was a suppression hearing here. The trial court determined that the defendant didn't invoke Miranda. The California Court of Appeal in addressing this issue – I know. That's why you're here in the federal court, where there's a little more respect. Another habeas case. Well, there's – You know how many habeas cases we get from the state of California every year? I'm sure there are many because we handle them, of course. Because of that, we have a whole cadre, maybe 30 magistrate judges that do nothing with law clerks, go through these. And what does the Californian court system do? Now, you look like a nice lady. Someday you're going to be attorney general, and I'll try to sell you on this idea. What does the Californian system do? They get postcards and denials and postcards and denial. And they don't do their job. And so we get all of the habeas matters. And we have to set up – it's almost breaking the federal budget. And out of the thousands that we get, like in L.A., I'll bet the last time I checked, it was about 20 years ago, you get 1,000 a year. You know how many writs are granted? No, I don't. About that time. One thing that I see my dear friend, Evel Younger, Evel, what are you complaining about? Your brother, the press, all the federal courts are interfering with us. And he says, well, it's a good story. And I said, yeah, Evel was a right up front guy. So that's your problem. And if the state court system maintains a higher level of the investigatory work done, and if the prosecutors weren't just desperate to get convictions, and wouldn't push the envelope, they'd have a better record. You know what the rate of conviction is in federal courts?  No, I don't. Month after month. It's very close to 100%, you know. You know what it is in the state court? No. Probably very close to 50%. Why do you have that difference? See? Because of the federal system, the investigative people, the prosecutorial arm. Goes to a grand jury. Goes to a grand jury. They're disciplined. At least they used to be before we had sentencing guidelines. But in the state court, it just doesn't work that way. And so you've got to develop professionalism by adhering to the rules. Like an athlete, you know, the one that follows the rules. Maybe when it comes to some other things, when they get in trouble, you do a much better job. But I'm trying to do it through stretching the rules. I've got a whole speech on this. My time's up. I'd be happy to sit here and listen to your honor. I understand your honor's concerns, certainly, about the system as a whole. And I don't know that the California state system is different than other states in that respect. I'm sure it's better. I would like to think so. I think California has the record as far as the number of citizens on death row. Well, that's true, although it doesn't have very many executions. No. No. I think the death penalty's been with us now back 25 years, a lot more than that. And I think we've executed. We've had about 500, 600 people there. And maybe we've executed four. So, at the end of the line, we don't have a lot to worry about, except right in this place. Right. While I understand your honor's concerns, certainly, and I do believe that the strictures of the Constitution should be upheld in state court as well as federal court, the state court of appeal here did address this issue. It addressed it. It applied the Miranda and Doyle principles. It even addressed Ninth Circuit precedent. It distinguished those cases. It came to a reasoned, thorough analysis of this issue. It came to a reasoned decision. And the decision that it made was not an unreasonable application of Supreme Court precedent. Did they acknowledge that the Miranda right may be injected by the defendant into the conversation well into the examination or not? What I think they do is they say that in this case, where that a defendant doesn't have a right to selectively invoke Miranda. They were wrong. Yeah, that's what's troubling me. Well, the following sentence says, if I may just read it for a moment. Once a defendant elects to speak after receiving a Miranda warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal was an invocation of Miranda rights. So here it's saying that if there is no invocation of Miranda after a valid waiver, the prosecution can use whatever the defendant says or doesn't say. But in this case, you have the indication. He says, in essence, he evades a direct answer to the interrogator and says, I don't understand. I can't answer. I can't give you an answer to that question. Whatever he says, he essentially is refusing to give a direct answer to the interrogator. And that is troublesome in light of Miranda. Well, it's our position that the defendant's statements were not, in fact, an invocation of Miranda. The California Court of Appeal held that it was not a valid invocation of Miranda. You're wrong. You're wrong about that. So we don't need to give you a message. I understand, which is what I'm trying to move on to, is that the California Court of Appeal's decision to the contrary was not an unreasonable application of Supreme Court precedent. And moreover, the Brecht standard of harmlessness applies even if this court does find error. And under the overwhelming evidence of the defendant's guilt, as Your Honor indicated earlier, and which is detailed in our brief, there really was no need for the prosecution to use this evidence because there was overwhelming evidence of the defendant's guilt. Well, I guess we should welcome it. Otherwise, we wouldn't have 30 magistrate judges. We've got three or four habeas matters on our calendar today. If you look at the work that's done, do you see what our magistrates do? I do because our office does that work as well. Yeah, a lot of well, but not as well as the magistrates. Well, I would defer to Your Honor's opinion on that. Not as well. And so they're very scholarly, the way they go through these. They spend sometimes long hearings, 40, 50, 60 pages. I think I understand your position. I want to say thank you for your presentation. Thank you very much. It's nothing personal. I understand. We're just trying to get to the bottom of it and do something rational. I certainly appreciate that effort. As a matter of fact, you remind me of the young lady that lived across the street. Her family is still there. And she's just as articulate, smart, charming as you are. Well, I appreciate that.  Well, thank you, Your Honor. Thank you. And this is all on TV, if you want to find it. Well, there's going to be downloading it. Yeah. Look it up to your resume. Is there anything the Court would like me to follow up on? I feel like the Court is clear on the issues. Have I seen you before? I don't believe so, Your Honor. What's your best case for the ability of the defendant to interrupt the interrogation and stop the questioning as to a specific topic in the middle of the interrogation? First of all, the Miranda footnote that says, and it's footnote 45, I think, that says you can answer some questions and refuse to answer others, and this is not a case like Rogers v. Richmond. This is interrogation. All right. Now, that's the federal rule as opposed to the California rule now? At this point, I think we would have to say that. Although, you know, in People v. Coffman and Marlow, the California Supreme Court kind of alluded to this problem, but there has not been a definitive ruling that's contrary in California. So the prosecutors are taking the position most advantageous to the government's position. I'm sorry? The prosecutors are taking the position most favorable to a prosecution. Right. Yeah, and they don't acknowledge the extent to which federal rule may apply in interrupting in the middle of an interrogation, right? Right. Okay. The other thing I would rely on is the language in Michigan v. Moseley, and it may have been repeated in Edwards v. Arizona, that when a suspect invokes his right to remain silent, it has to be scrupulously honored. Do you teach this stuff here? No, I don't, Your Honor. Why not? It always seemed to me that being a professor in a law school would be even a harder job than what I have now. I had some very good professors when I was in law school. Where did you go? Boalt, UC Berkeley. I knew you were a Berkeley guy. What class were you in? Sixty-nine, Your Honor. Oh, well, I got out in the fifties. It was still good in the sixties. I want to thank both counsel for the argument. It was very helpful. Thank you, Your Honor. We've had really good lawyers today. It was a real pleasure. Thank you for hearing our argument. Okay, thank you.
judges: Pregerson, Beezer, Thompson